## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### IN ADMIRALTY

### CASE NO. 21-cv-24219-ALTMAN/Reid

**CLEAR SPRING PROPERTY AND
CASUALTY COMPANY**,

  *Plaintiff*,

*v.*

**DREAM ON YACHT LLC**,

  *Defendant*.

_____/

### **ORDER**

  Clear Spring Property and Casualty Co., our Plaintiff, has filed a Motion for Summary Judgment [ECF No. 40] on Count VI of its Amended Complaint [ECF No. 27]. In that count, Clear Spring argues that Policy No. CSRYP/203287—a maritime-insurance policy it issued in 2021 to Dream On Yacht LLC, our Defendant—is void *ab initio* because Dream On failed to disclose certain material facts in its insurance application. Clear Spring thus seeks a declaratory judgment that the Policy doesn't afford coverage to Dream On for the loss it incurred on June 25, 2021. Upon careful review of the Motion, the record, and the governing law, we now **GRANT** the Plaintiff's Motion for Summary Judgment [ECF No. 40].

## THE FACTS[1]

Clear Spring Property and Casualty Co. ("Clear Spring") is an "insurance carrier" that is "admitted[ and] licensed . . . in the State of New York." Joint Statement of Undisputed Facts ("JSOUF") [ECF No. 46] ¶ 31 (citing Deposition of Beric Usher as Corporate Representative of Clear Spring Property and Casualty Co. ("Usher 30(b)(6) Dep.") [ECF No. 39-2] at 95:4–5). As part of its business model, Clear Spring uses an "underwriting agent . . . to receive and [ ] evaluate applications for [ ] marine insurance coverage[.]" *Id.* ¶ 1 (citing Declaration of Beric Usher ("Usher Decl.") [ECF No. 39-1] ¶ 12). One of those agents is Concept Special Risks Ltd. ("Concept"), "a marine insurance underwriting firm incorporated in the United Kingdom." Usher Decl. ¶ 4.

On May 21, 2021, Lucantha Marine Insurance ("Lucantha"), an "approved producing broker" of Concept's, *see* Usher 30(b)(6) Dep. at 7:1–5; *see also id.* at 7:5–6 ("That is to say, they are authorized to submit business to us for us to review[.]"), approached Concept on behalf of Dream On Yacht LLC ("Dream On") to "request[ ] a quote for marine insurance coverage," JSOUF ¶ 2 (first citing Usher 30(b)(6) Dep. at 90:3–15; and then citing Lucantha May 21 Email [ECF No. 39-

---

[1] On a motion for summary judgment, we describe the facts "in the light most favorable to [the non-moving party]." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 n.2 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant]."). We accept these facts for summary-judgment purposes only and recognize that "[t]hey may not be the actual facts that could be established through live testimony at trial." *Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268, at *1 n.1 (N.D. Ala. Nov. 16, 2016); *see also Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion may not be the actual facts. They are, however, the facts for present purposes[.]" (cleaned up)). In considering Clear Spring's Motion, then, we must describe the facts in the light most favorable to the Defendant and rely on Clear Spring's Statement of Facts [ECF No. 39] only where the Defendant has failed to genuinely dispute a proposition Clear Spring has asserted there, *see* S.D. FLA. L.R. 56.1(b) ("All material facts set forth in the movant's statement filed and supported as required above will be deemed admitted unless controverted by the opposing party's statement provided that the Court finds that the movant's statement is supported by evidence in the record."); *see also Atl. Cas. Ins. Co. v. Ca'D'Oro, LLC*, 362 F. Supp. 3d 1268, 1272 (S.D. Fla. 2018) (Altonaga, J.) ("At summary judgment . . . [c]ourts must consider the entire record and not just the evidence singled out by the parties." (citing *Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1570 (11th Cir. 1987))).

3]). Dream On was seeking to insure its "2006 90' Tecnomar vessel" (the "Vessel"). Usher Decl. ¶ 18.

Concept then sent Lucantha a quote "offering terms for marine insurance," JSOUF ¶ 4 (first citing Quote No. 448199A (the "Quote") [ECF No. 39-4]; and then citing Usher 30(b)(6) Dep. at 27:1–28:5), which provided over $1,000,000 in coverage for damage related to the Vessel's hull, third-party liability, and uninsured boaters, *see* Quote at 1. The Quote "was issued 'subject to'" Dream On's "submission of Concept's application." JSOUF ¶ 6 (quoting Quote at 2).

On June 2, 2021, "Dream On executed and submitted to Concept, via Lucantha, a completed and signed" application form for coverage on the Vessel. JSOUF ¶ 8 (citing Application [ECF No. 27-1]). The application listed "Dream On LLC" as the "assured," "William Pyznar" (Dream On's sole member) as the Vessel's "beneficial owner," and "Jovanny Rodriguez" as the Vessel's "named operator." Application at 1–3 (cleaned up); *see also* JSOUF ¶ 11 ("Pyznar is the sole member of [Dream On]." (citing Deposition of William Pyznar as Corporate Representative of Dream On LLC ("Pyznar 30(b)(6) Dep.") [ECF No. 39-7] at 11:8–11)). Pyznar filled out the application with the assistance of Rodriguez, *see* Pyznar 30(b)(6) Dep. at 37:20–21 ("There's a portion on this application that I asked [Rodriguez] to help me fill out."), and Humberto Peña, "an insurance agent with WriteWay Insurance," JSOUF ¶¶ 21–22 (first citing Pyznar 30(b)(6) Dep. at 44:13–45:17; and then citing Deposition of Humberto Peña ("Peña Dep.") [ECF No. 39-5] at 32:17–21). Ultimately, Pyznar reviewed and signed the application before submitting it. *See* Pyznar 30(b)(6) Dep. at 21:4–6 ("Q. So you reviewed and signed this document. Correct? A. That is correct.").

The application form asked several questions—two of which are relevant here. *First*, Question 11 asked "have you or any named operator been involved in a loss in the last 10 years[?] (insured or not)," to which Pyznar checked "no." Application at 3 (cleaned up). *Second*, Question 12

3

asked: "[H]ave you or any named operators been convicted of a criminal offence [sic] or pleaded no contest to a criminal action?" *Ibid.* Pyznar, after asking Rodriguez about his criminal history, *see* Pyznar 30(b)(6) Dep. at 38:15–24 ("Q. And did you ask [Rodriguez] that? A. Yes, I -- I asked him. . . . Q. He told you 'no'. Correct? A. That's right."), answered "no," *see* Application at 3. That question was reproduced in the "Named Operator" section of the application—and there, again, it was checked "no." *See ibid.* ("Have you ever been convicted of a criminal offence [sic] or pleaded no contest? . . . No"); *see also* JSOUF ¶ 29 ("Pyznar reviewed the Application section for details concerning any Named Operator with Capt. Rodriguez." (citing Pyznar 30(b)(6) Dep. at 37:17–38:24)).

According to Clear Spring, those answers weren't wholly accurate. As it turns out, the Vessel "suffered a prior[ ] loss in July 2018 [(the "July 2018 Loss")] shortly after Mr. Pyznar purchased it individually, when the Vessel ran aground while it was being transported to Miami[.]" JSOUF ¶ 20 (citing Pyznar 30(b)(6) Dep. at 14:2–24). Pyznar "was not involved in that loss," though, since the accident occurred before he had "even seen the boat or had the boat in [his] possession[.]" Pyznar 30(b)(6) Dep. at 44:23–45. And this was before Pyznar transferred ownership of the Vessel to Dream On. *See* Amended Complaint, *Pyznar v. Certain Underwriters at Llyod's London*, No. 19-cv-22517 (S.D. Fla. filed July 3, 2019) ("*Pyznar* Amnd. Compl."), ECF No. 39-10 at 1 (listing Pyznar (not Dream On) as the plaintiff who "had a policy of insurance . . . on Plaintiff's 2006 Tecnomar Velvet 90"). Pyznar testified that he spoke with Peña before answering this question, and Peña told him to "answer that as 'no' because [Pyznar was] not involved in the loss." Pyznar 30(b)(6) Dep. at 45:5–8.

The answer to the other question—whether "any named operators [have] been convicted of a criminal offence [sic]," Application at 3—wasn't accurate at all. Rodriguez *had been* convicted of "burglary, grand theft, and criminal misdemeanor in 2006." JSOUF ¶ 23 (cleaned up); *see also* Deposition of Jovanny Rodriguez ("Rodriguez Dep.") [ECF No. 39-11] at 9:9–11 ("Q. Have you

ever been convicted of or pleaded no contest to a crime? A. Yes, I have."); *State v. Rodriguez* Docket Sheet [ECF No. 39-12] at 1 (showing that Rodriguez had been convicted of three felonies). Pyznar didn't know that, though, because Rodriguez lied to him about having a clean criminal record. *See* Pyznar 30(b)(6) Dep. at 38:15–24 ("Q. And did you ask [Rodriguez] that? A. Yes, I -- I asked him. . . . Q. He told you 'no'. Correct? A. That's right."); *id.* at 42:18–20 ("I never knew he had any record, obviously that's why that says 'no' on the form.").

"In reliance on the truth and completeness of the information disclosed," Concept approved the application and issued Dream On "Policy No. CSRYP/203287," which covered "$1,030,000 in first-party property damage" for the Vessel. JSOUF ¶ 17 (first citing Policy No. CSRYP/203287 (the "Policy") [ECF No. 27-2]; and then citing Usher Decl. ¶ 24). The Policy detailed that it was "a legally binding insurance contract . . . incorporating in full the [signed] application form[.]" Policy at 4; *see also id.* at 12 ("This insuring agreement incorporates in full your application for insurance and together with any endorsements issued herein, constitutes the entire contract between us."). That contract, according to the terms of the Policy, would be rendered "null and void in the event of non-disclosure or misrepresentation of a fact or circumstances material to [the] acceptance or continuance of this insurance." *Id.* at 13. The initial quote Concept sent to Lucantha also included these terms. *See* Quote at 1, 4, 12–13.

On June 13, 2021, "during the term of the Policy," JSOUF ¶ 18, the Vessel suffered a partial loss (the "June 2021 Loss"), "where a fitting below water broke and the engine room was filling with water," Pyznar 30(b)(6) Dep. at 52:14–16. Pyznar "provided written notice of the loss to Humberto Peña . . . via email on June 24, 2021," and Peña "reported the loss to Lucantha via email th[at] same day[.]" JSOUF ¶ 19 (first citing Pyznar 30(b)(6) Dep. at 51:14–54:14; and then citing June 2021 Email Thread [ECF No. 39-8]). Lucantha then reported the loss to Concept on June 25, 2021. *Ibid.* "Following an investigation into the facts and circumstances of the loss," Clear Spring came to

believe that Dream On had made "material misrepresentation[s] of fact" during the underwriting process. Plaintiff's Statement of Facts ("Pl.'s SOF") [ECF No. 39] ¶ 21 (citing Complaint [ECF No. 1] ¶ 11–62).[2]

On December 1, 2021, Clear Spring sued Dream On, seeking a declaratory judgment that would "adjudicate and determine the rights of the parties" under the Policy. Compl. ¶ 1. In its Amended Complaint [ECF No. 27], Clear Spring asserts six counts against Dream On—each articulating a separate reason for the insurer's view that Dream On *wasn't* covered for the June 2021 Loss. *See* Amnd. Compl. ¶¶ 18–24 (Count I: Lack of Fortuity); *id.* ¶¶ 25–31 (Count II: Exclusion for Wear and Tear); *id.* ¶¶ 32–38 (Count III: Exclusion for Various Defects); *id.* ¶¶ 39–45 (Count IV: Exclusion for Damage to Engines); *id.* ¶¶ 46–53 (Count V: Unseaworthiness); *id.* ¶¶ 54–66 (Count VI: *Uberrimae Fidei*).

---

[2] We don't know the extent to which Dream On disputes this statement because Dream On never filed a response statement of material facts, as it was required to do by our Local Rules. *See* S.D. FLA. L.R. 56.1(b)(2)(A) ("In addition to complying with the requirements of sub-section (b)(1), an opponent's Statement of Material Facts shall correspond with the order and paragraph numbering format used by the movant, but it shall not repeat the text of the movant's paragraphs."). In its response brief, Dream On tells us that the "Defendant has responded herein [*i.e.*, in the brief] to Plaintiff's Statement of Material Facts including rebutting the facts and law[.]" Defendant's Response [ECF No. 41] at 1. That's not good enough. Our Local Rules *mandate* that an "opponent's Statement of Material Facts shall clearly challenge any purportedly material fact asserted by the movant" in a "*separate* document," using, "as the very first word in each paragraph-by-paragraph response, the word 'disputed' or 'undisputed.'" S.D. FLA. L.R. 56.1(a)–(b). Because Dream On ignored our rules, "a[]ll material facts in [Clear Spring's] Statement of Material Facts may be deemed admitted," provided that they're "supported by properly cited record evidence" and are not otherwise improper under Federal Rule of Civil Procedure 56. *See* S.D. FLA. L.R. 56.1(c); *see also Deegan v. Aquino*, 2018 WL 10399979, at *1 (S.D. Fla. Feb. 23, 2018) (Lenard, J.) ("[I]t is the nonmovant's obligation to specifically bring the factual dispute to the court's attention by rebutting the movant['s] factual statements on a paragraph by paragraph basis and with specific citations to the record." (cleaned up)). And, since the record shows that Clear Spring investigated Dream On's claim, *see, e.g.*, Pyznar 30(b)(6) Dep. at 57:17–25 ("Q. Did you feel any sort of pressure . . . from Clear Spring, or from Concept, that you had to cooperate with the adjusting of the claim . . . or the investigation of the claim[?] . . . A. I did not feel any pressure. No, I didn't."), we'll take the fact of the investigation as admitted.

Dream On responded with two counterclaims against Clear Spring: one for breach of insurance contract, and a second for breach of *uberrimae fidei. See* Defendant's Amended Answer ("Amnd. Ans.") [ECF No. 4] at 9–11.

Clear Spring has since filed a Motion for Summary Judgement ("MSJ") [ECF No. 27] as to Count VI of the Amended Complaint. In that count, Clear Spring argues that the Policy doesn't cover the June 2021 Loss because Dream On's omission of material facts in its insurance application rendered the policy void *ab initio* under the doctrine of *uberrimae fidei. See* MSJ at 1 ("[T]he policy will be null and void in the event of a misrepresentation and/or non-disclosure of [material] facts . . . [and] the Defendant made material misrepresentations of fact on the application for insurance.") We'll address that Motion below.

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See ibid.*

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine

issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."); *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note to 2010 amendment)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (Ungaro, J.). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994))).

## ANALYSIS

In Count VI (the only claim at issue here), Clear Spring seeks a declaration that the Policy doesn't cover the June 2021 Loss because Dream On breached the doctrine of *uberrimae fidei*—tus

rendering the Policy void *ab initio*. *See* MSJ at 1. *Uberrimae fidei*, meaning "utmost good faith," is a maritime doctrine which "requires that an insured fully and voluntarily disclose to the insurer all facts material to a calculation of the insurance risk."[3] *HIH Marine Servs., Inc. v. Fraser*, 211 F.3d 1359, 1362 (11th Cir. 2000) (first citing *Steelmet, Inc. v. Caribe Towing Corp.*, 747 F.2d 689, 695 (11th Cir. 1984); then citing *Fireman's Fund Ins. Co. v. Wilburn Boat Co.*, 300 F.2d 631, 646 (5th Cir. 1962); and then citing GRANT GILMORE & CHAS. L. BLACK, JR., THE LAW OF ADMIRALTY 62 (2d ed. 1975)); *see also ibid.* ("It is well-settled that the marine insurance doctrine of *uberrimae fidei* is the controlling law of this circuit." (collecting cases)). Under this doctrine, an insured's "duty to disclose extends to those material facts *not* directly inquired into by the insurer." *Id.* at 1362–63 (emphasis added) (first citing *Jackson v. Leads Diamond Corp.*, 767 F. Supp. 268, 271 (S.D. Fla. 1991) (Roettger, J.); and then citing *Cigna Prop. & Cas. Ins., Co. v. Polaris Pictures Corp.*, 159 F.3d 412, 420 (9th Cir. 1998)).

*Uberrimae fidei* provides that a "material misrepresentation[,] . . . even if it is a result of 'mistake, accident, or forgetfulness,'" on "an application for marine insurance is grounds for voiding the policy." *Id.* at 1363 (quoting *Steelmet*, 747 F.2d at 695); *see also Kilpatrick Marine Piling v. Fireman's*

---

[3] The Policy provides that "any dispute hereunder shall be adjudicated according to . . . substantive United States Federal Admiralty law and practice," and that New York substantive law applies "where no such well established, entrenched precedent exists[.]" Policy at 16. "Under federal maritime choice of law rules, contractual choice of law provisions are generally recognized as valid and enforceable, unless the choice of law is shown to be unreasonable and unjust, or in conflict with a fundamental purpose of maritime law." *Great Lakes Reins. (UK) PLC v. Yellow Fin 36 LLC*, 736 F. Supp. 2d 1302, 1306 (M.D. Fla. Aug. 26, 2010) (Kovachevich, J.); *see also Great Lakes Ins. SE v. Raiders Retreat Realty Co.*, 601 U.S. 65, 76 (2024) ("As a matter of federal maritime law, choice-of-law provisions in maritime contracts are presumptively enforceable[,] . . . [unless] the chosen law would contravene a controlling federal statute . . . or conflict with an established federal maritime policy, . . . [or when] the parties can furnish no reasonable basis for the chosen jurisdiction." (cleaned up)). Here, the Policy's New York choice-of-law provision is reasonable, since that state bears a "normal relationship with the transaction." *Inetianbor v. CashCall, Inc.*, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015) (Cohn, J.) (quoting *Cont'l Mortg. Invs. v. Sailboat Key, Inc.*, 395 So. 2d 507, 509 (Fla. 1981)); *see also* JSOUF ¶¶ 31–33 ("Clear Spring is an admitted, licensed insurance carrier[,] . . . maintains bank accounts[,] . . . [and] accepts service of process through attorneys in the State of New York." (cleaned up) (citing Usher 30(b)(6) Dep. at 95:4–10)). We'll therefore apply federal maritime law when relevant and New York law on all other substantive legal questions.

*Fund Ins. Co.*, 795 F.2d 940, 943 (11th Cir. 1986) ("[C]oncealment of such facts voids the policy, whether the concealment be due to fraud, negligence, accident, or mistake."). A misrepresentation is considered "material" if it "might have a bearing on the risk to be assumed by the insurer." *HIH Marine*, 211 F.3d at 1363 (cleaned up); *see also Colum. Ins. Co. of Alexandria v. Lawrence*, 35 U.S. (10 Pet.) 507, 516 (1836) (Story, J.) ("Whenever the nature of this interest would have, or might have a real influence upon the underwriter, either not to underwrite at all, or not to underwrite except at a higher premium, it must be deemed material to the risk[.]"). "In the context of marine insurance disputes, the issue of materiality is a mixed question of law and fact that the court can answer as a matter of law only 'if reasonable minds could not differ on the question.'" *Great Lakes Ins. SE v. SEA 21-21 LLC*, 568 F. Supp. 3d 1318, 1324 (S.D. Fla. 2021) (Altonaga, C.J.) (quoting *Great Lakes Reins. (UK) PLC v. Roca*, 2009 WL 200252, at *4 (S.D. Fla. Jan. 27, 2009) (Moreno, C.J.)).

Here, Clear Spring argues that Dream On's failure to disclose the Vessel's July 2018 Loss constitutes a "misrepresentation of material fact" that's sufficient to void the Policy. *See* MSJ at 2–3. We agree.

Although courts often conclude that "'[m]arine loss history' is a fact material to the risk assumed in providing insurance," *Great Lakes Reins. (UK) PLC v. Yellow Fin 36 LLC*, 736 F. Supp. 2d 1302, 1306 (M.D. Fla. Aug. 26, 2010) (Kovachevich, J.) (citing *All Underwriters at Lloyd's (London) v. Kenney*, 986 F. Supp. 1384 (S.D. Fla. 1997) (Gonzalez, J.), *aff'd* 144 F.3d 56 (11th Cir. 1998)),[4] "the Eleventh Circuit has never adopted [a] bright-line rule" to that effect, *SEA 21-21*, 568 F. Supp. 3d at

---

[4] *See also Great Lakes Reins. PLC v. Arbos*, 2009 WL 8642003, at *5 (S.D. Fla. Jan. 6, 2009) (Ungaro, J.) ("[C]ourts have routinely found that an insurance applicant's loss history is a fact material to the risk." (first citing *Certain Underwriters at Lloyd's v. Montford*, 52 F.3d 219, 222 (9th Cir. 1995); then citing *Kenney*, 986 F. Supp. at 1385–86; then citing *Certain Underwriters at Lloyd's, London v. Inlet Fisheries Inc.*, 518 F.3d 645, 655–56 (9th Cir. 2008); then citing *N.H. Ins. Co. v. C'Est Moi, Inc.*, 406 F. Supp. 2d 1077, 1083 (C.D. Cal. 2005); and then citing *Albany Ins. Co. v. Horak*, 1993 WL 269620 (E.D.N.Y. July 13, 1993))).

1325 (quoting *AIG Centennial Ins. Co. v. O'Neill*, 2013 WL 10450139, at *14 (S.D. Fla. May 9, 2013)

(Zloch, J.)). As such, "courts in the Eleventh Circuit have employed 'a more fact-specific inquiry'

regarding the question of materiality." *Ibid.* (first quoting *O'Neill*, 2013 WL 10450139, at *14; and

then citing *Markel Am. Ins. Co. v. Fernandez*, 2010 WL 11602243, at *3 (S.D. Fla. July 20, 2010) (Gold,

J.)). We'll do the same here.

  To support its claim that disclosure of the July 2018 Loss would have affected "the

underwriter's decision to accept or reject the insurance, or with respect to what premium to charge,"

MSJ at 6 (emphasis omitted) (quoting *Certain Underwriters at Lloyds, London v. Giroire*, 27 F. Supp. 2d

1306, 1313 (S.D. Fla. 1998) (Gold, J.)), Clear Spring offers a declaration and deposition testimony

from Beric Usher, Concept's "Managing Director and Senior Underwriter," Usher Decl. ¶ 5. In his

Declaration, Usher tells us why an insurance company would want to know someone's loss history

before pricing a quote:

> The matter of an insured's loss history, whether he or she was at the helm when such
> a loss occurred or not, . . . is an indicator of the insured's care and skill in managing
> and maintaining the vessel, and it is the best indicator of the likelihood of future
> losses. . . .  In many respects, a vessel is only as good as its owner. This is not just an
> observation about the owner's skill in operating the vessel but also how he maintains
> her and supplies and crews her.

*Id.* ¶¶ 32–33 (cleaned up). Based on the premise that prior loss is one of "the best (and only)

indicators of future risk," Usher Decl. ¶ 31; *see also id.* ¶ 29 ("[Insurers] have no ability to judge the

nature of the risk being presented by any means other than the information disclosed by the

prospective insured."), Usher concludes that, "[h]ad [Dream On] truthfully disclosed on the

Application that the Vessel suffered a prior loss in July 2018, Underwriters would still have issued

the Policy but we would have charged 10% higher premium, or approximately $2,000.00 more," *id.* ¶

34. Usher explained how he arrived at that figure:

> Q. Had the [July 2018 Loss] been reported on this form, would you have still
> underwritten this policy?

A. Yes, but at a higher premium.

Q. What would the premium have been?

A. It would have been approximately $2,000 more.

Q. And do you have any type of chart or guidelines regarding previous losses and scale to determine what the additional costs would be?

A. No, not as such. If there is a single loss, depending on the size of the loss. If the loss is a substantial loss, this would not qualify as a truly substantial loss. It was meaningful and significant but not substantial, then the underwriter could proceed with a loading for the loss record. If it was a substantial loss, again, it would be referred to me for individual approval.

Q. What is the cutoff for substantial loss?

A. Around [$150,000], $200,000.

Usher 30(b)(6) Dep. at 37:5–38:3.

Dream On has offered *no evidence* to rebut Usher's description of how a vessel's prior-loss history factors into the insurer's risk pricing. *See generally* Defendant's Response ("Resp.") [ECF No. 41]. Instead, Dream On decries Usher's testimony as "self-serving" and (therefore) "not enough to overcome Plaintiff's burden on summary judgment." *Id.* at 13 (first citing *SEA 21-21*, 568 F. Supp. 3d at 1325; and then citing *Roca*, 2009 WL 200252, at *6). We disagree.

To begin with, "there's nothing wrong with a party relying, at summary judgment, on [ ] self-serving statements[.]" *Inskeep v. Baccus Global, LLC*, 2024 WL 416357, at *6 (S.D. Fla. Feb. 5, 2024) (Altman, J.) (citing *Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir. 2005)). And, while Dream On tells us that some courts in our District have observed that the "retrospective, self-serving statements of [an] insurance underwriter, alone, are inadequate to support the insurer's claim of materiality," Resp. at 13 (first quoting *SEA 21-21*, 568 F. Supp. 3d at 1325; and then citing *Roca*, 2009 WL 200252, at *6), we decline to find that an underwriter's statements are *per se* insufficient as a matter of law to establish materiality at summary judgment.

The roots of this purported rule trace back to *AXA Global Risks (UK) Ltd. v. Pierre*, 2001 WL 1825853 (S.D. Fla. Nov. 8, 2001) (Moore, J.). The issue there was whether the fact that the defendant "did not disclose . . . that his wife . . . was the true owner of the vessel . . . was material to [the insurer's] risk[.]" *Id.* at *5. Following the longstanding principle "that 'conclusory allegations without specific supporting facts have no probative value,'" *id.* at *5 (quoting *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)), the court found that an underwriter's conclusory statement "in an affidavit that he would not have issued the policy to [the defendant] for a vessel owned by his wife"—without more—"did not create a genuine issue of material fact that would preclude the entry of summary judgment in favor of defendants," *ibid.* (cleaned up). So far so good.

Eight years later, *Roca* rearticulated this rule, interpreting *AXA Global* to mean that "[a]fter-the-fact, *conclusory* statements by the insurer that a certain fact was material and would have affected its decision to insure are simply not adequate grounds upon which the Court can conclude, as a matter of law, that an omitted fact was material." *Roca*, 2009 WL 200252, at *6 (emphasis added). Instead, the *Roca* Court held, "the insurer must provide some specific evidence capable of showing the omitted fact's materiality." *Ibid.* (citing *AXA Global*, 2001 WL 1825853, at *9). In that case, the underwriter's testimony that, had certain facts been disclosed, the insurer "would have assessed a ten percent (10%) loss-record debit," was "inconsistent with and unsupported by [the insurer's] own written guidelines." *Ibid.* (cleaned up). So, in holding that neither party was "entitled to a finding before trial [on whether] the misrepresentation was . . . material," *ibid.*, *Roca* "affirm[ed] that when underwriters' statements are inherently contradictory or entirely conclusive, they are insufficient to support a finding of materiality on summary judgment." *Shoreline Found. Inc. v. N.Y. Marine & Gen. Ins. Co.*, 2021 WL 4393082, at *4 (S.D. Fla. Aug. 23, 2021) (Dimitrouleas, J.) (citing *Roca*, 2009 WL 200252, at *6). The "decision in *Roca*, however, does not disqualify *all* underwriters' statements as

conclusory and self-serving." *Great Lakes Ins. SE v. Chartered Yachts Miami LLC*, 676 F. Supp. 3d 1251, 1260 (S.D. Fla. 2023) (Williams, J.) (emphasis added).

Which brings us to *SEA 21-21*. Citing (but not quoting) *Roca*, *SEA 21-21* declared that "retrospective, self-serving statements of [an] insurance underwriter, alone, are inadequate to support the insurer's claim of materiality." 568 F. Supp. 3d at 1326 (citing *Roca*, 2009 WL 200252, at *6). Obviously, that drops the requirement that the statement *also* be "conclusory," which was the key doctrinal point underlying the *AXA Global* and *Roca* holdings. *See AXA Global*, 2001 WL 1825853, at *5 ("[C]onclusory allegations without specific supporting facts have no probative value[.]" (quoting *Evers*, 770 F.2d at 986)); *Roca*, 2009 WL 200252, at *6 ("After-the-fact, *conclusory* statements by the insurer that a certain fact was material and would have affected its decision to insure are simply not adequate grounds upon which the Court can conclude, as a matter of law, that an omitted fact was material." (emphasis added)). Federal Rule of Civil Procedural 56(c) does not carve out an "underwriter's exception" for summary-judgment evidence, *cf.* FED. R. CIV. P. 56(c), and we won't be inventing one, *see* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 93 (2012) ("Nothing is to be added to what the text states or reasonably implies . . . . That is, a matter not covered is to be treated as not covered."). So long as the underwriter's statement was "made on personal knowledge" by a "competent" declarant on "facts that would be admissible in evidence," FED. R. CIV. P. 56(c)(4), we see no reason why courts should treat an underwriter's declaration differently than anyone else's, *see Feliciano v. City of Miami*, 881 F.3d 853, 857 (11th Cir. 2018) ("[Even if] sworn statements are self-serving, [ ] that alone does not permit us to disregard them at the summary judgment stage.").

Here, Usher doesn't just *conclude* that the Vessel's loss history was "material"—nor does he merely speculate that the Vessel's loss history would have "influence[d] the mind of a prudent and intelligent insurer in determining whether he would accept the risk." *Kilpatrick Marine*, 795 F.2d at

942–43. Instead, Usher explains with "specific facts" *why* loss history would matter in measuring insurance risks. *Evers*, 770 F.2d at 986; *see also* Usher Decl. ¶¶ 32–33 (explaining that loss history "is an indicator of the insured's care and skill in managing and maintaining the vessel[,] . . . [and] how he maintains her and supplies and crews her"). Usher's statements are therefore competent evidence to support Clear Spring's claim that this misrepresentation was "material because [it] involved criteria that the insurer used to determine whether to issue the marine insurance policy on the vessel." *Chartered Yachts*, 676 F. Supp. 3d at 1262.

But, even if we were to ignore Usher's statements, Clear Spring has offered *other* evidence supporting the materiality of the Vessel's loss history—*viz.*, Concept's Underwriting Manual ("Manual") [ECF No. 39-14]. The Manual states that Concept's underwriters "*must* consider" the "owner and operators['] . . . past loss records on boats as well as on the land," and that, "[i]f an owner has had previous losses, these *must* be taken into consideration when deciding whether or not to offer terms and these will impact the price charged." *Id.* at 6 (emphasis added); *see also* Application at 1 (listing "William Pyznar" as "Beneficial Owner"). Even the *SEA 21-21* Court, which refused to credit the underwriter's declaration, accepted this *same* excerpt from the Manual as "specific, undisputed evidence supporting the conclusion that [the insurer] might have considered [the defendant's] loss history before offering [the defendant] marine insurance coverage," leading the court to find the defendant's "loss history material as a matter of law." 586 F. Supp. 3d at 1326–27 (citing *Roca*, 2009 WL 200252, at *4). The Manual also instructs that the circumstances of "the vessel itself" is one of the "principle [sic] aspects to any yacht risk[.]" Manual at 3. Since the "contents or accuracy" of the Manual aren't disputed here, we likewise find that the Manual renders Pyznar's and the Vessel's "loss history material as a matter of law." *Ibid.* (cleaned up).

Having produced competent evidence of a material misstatement by Dream On, Clear Spring "is entitled to summary judgment unless [Dream On], in response, 'come[s] forward with

significant, probative evidence demonstrating the existence of a triable issue of fact.'" *United States v. Four Parcels of Real Prop. in Green & Tuscaloosa Cntys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (first quoting *Chanel, Inc. v. Italian Activewear, Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991); then citing FED. R. CIV. P. 56(e); and then citing *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting)). But Dream On "has not provided any testimony regarding the factors bearing on the risk to be assumed by an insurer[.]" *Chartered Yachts*, 676 F. Supp. 3d at 1262 (citing *Great Lakes Ins. SE v. Sunset Watersports, Inc.*, 570 F. Supp. 3d 1252, 1265–66 (S.D. Fla. 2021) (Dimitrouleas, J.); *see generally* Resp. Dream On has thus failed to create a "genuine issue of material fact" on the question of materiality. *Celotex*, 477 U.S. at 323; *see also Chartered Yachts*, 676 F. Supp. 3d at 1262 ("Multiple courts in this district have found that an unrebutted affidavit from this very same underwriter, Beric Usher, suffices to establish the materiality of a misrepresented fact." (first citing *Great Lakes Reins. (UK) PLC v. Morales*, 760 F. Supp. 2d 1315 (S.D. Fla. 2010) (Gold, J.); and then citing *Great Lakes Reins. PLC v. Barrios*, 2008 WL 6032919 (S.D. Fla. Dec. 10, 2008) (Ungaro, J.)). Nor do any of Dream On's other arguments prevent us from concluding that Clear Spring "is entitled to judgment as a matter of law" on its *uberrimae fidei* claim. FED. R. CIV. P. 56(a).

*First*, Dream On offers a series of interrelated arguments—all intended to show that, because "[t]he Assured . . . is Dream On," and not Pyznar *personally*, Dream On answered the question, "[h]ave *you* or any named operator been involved in a loss in the last 10 years[?]," "truthfully[.]" Resp. at 5 (emphasis added). According to Dream On, "from the plain meaning of the language in the Application, and taking the Application as a whole, it is clear that 'you' in Question 11 was directed at the Assured Dream On." *Id.* at 5; *see also id.* at 11 ("The Application as a whole itself also clearly shows the intent that 'you' is meant solely to describe the Assured."); *id.* at 9 ("Plaintiff has failed to show that the Application has incorporated by reference the definition [of 'you' (which includes both the assured and the beneficial owner)] used [in] the Quotation and the Policy[.]"). And

it's "undisputed that Dream On has never been involved in a loss in the last 10 years." *Id.* at 5. So, because the "Plaintiff provides no legal mechanism or reasonable interpretation that Dream On and William Pyznar are legally the same entity," *id.* at 7, Dream On says that "there is no issue of fact as to whether Dream On answered the question truthfully," *id.* at 5.

But here's the thing: Even if the Application inquired only into Dream On's loss history—a proposition we'll assume but not decide—Dream On *still* would have breached its duty of utmost good faith for not disclosing the July 2018 Loss. That's because the doctrine of *uberrimae fidei* requires Dream On to disclose "*all* facts material to a calculation of the insurance risk," even if those facts are "not directly inquired into by the insurer." *HIH Marine*, 211 F.3d at 1362–63 (emphasis added). And, as the Manual makes clear, the loss history of the "vessel"—not just the "assured"—is crucial in "enabl[ing] [the underwriter] to form a complete picture of the whole risk." Manual at 5.[5] Since Dream On didn't "fully and *voluntarily* disclose to the insurer" those material facts, *HIH Marine*, 211 F.3d at 1362 (emphasis added), it failed to show utmost good faith in applying for the insurance policy.

*Second*, Dream On says that we should overlook this omission because Peña, "knowing [that] William Pyznar individually had been involved in a prior loss," "represented to Dream On . . . that the answer for Question 11 was 'no[.]'" Resp. at 6 (citing Pyznar 30(b)(6) Dep. at 44:10–25). But that mistake doesn't excuse Dream On's failure to disclose. *See Kilpatrick Marine*, 795 F.2d at 943 ("[C]oncealment of such facts voids the policy, whether the concealment be due to fraud,

---

[5] *See also* Manual at 5 ("In many respects, a vessel is only as good as its owner. This is not just an observation about the owner's skill in operating the vessel but also how he maintains her and supplies and crews her. . . . Our application form asks specific questions about *both vessel and operator* to enable us to form a complete picture of the whole risk." (emphasis added)); *id.* at 6 ("[A]n owner could have had a number of small grounding incidents that caused damage to his vessel but not enough to impact a policy. This would suggest that sooner or later if the pattern continues, he will commit a major navigational error that will result in an expensive insurance claim. . . . As far as [non-weather-related] past losses are concerned, as a rule, one is unfortunate; two begins to look like carelessness. More than that and the owner is probably not insurable.").

negligence, accident, or *mistake*." (emphasis added)). In filling out the form for Dream On, Pyznar was obligated to "make full disclosure of all material facts of which [he had], or ought to have [had], knowledge[.]" Plaintiff's Reply [ECF No. 47] at 3 (quoting *Grande v. St. Paul Fire & Marine Ins. Co.*, 436 F.3d 277, 283 (1st Cir. 2006)). Since Pyznar *knew* about the Vessel's July 2018 Loss when he submitted his application on behalf of Dream On, *see e.g.*, Pyznar 30(b)(6) Dep. at 44:18–22 ("I had asked the agent -- because of the circumstances surrounding . . . that loss, I had asked the agent, Humberto Peña, from Writeway Insurance -- as we were filling it out I explained that there was a loss[.]"); *see also* Application at 4 ("Assured Signature: William Pyznar"), Dream On still violated *uberrimae fidei* by not disclosing that fact.

Relatedly, Dream On claims that it *did* disclose the July 2018 Loss to Clear Spring because "Peña held himself out as a dual agent representing both the Insurer and the Assured." Resp. at 6 (citing Pyznar 30(b)(6) Dep. at 45:23–25, 46:1–8). Pyznar testified at his deposition that Peña "told [Pyznar]" during a "phone call" that "he's a dual agent." Pyznar 30(b)(6) Dep. at 46:3–10 (emphasis omitted); *see also id.* at 45:11–17 ("Q. . . . So you interpreted that question as to not encompass the Lloyd's claim? A. Yes. After speaking with the . . . dual agent and he advised me that my -- that the interpretation is correct, that I was not involved in it." (emphasis omitted)). Dream On also says that Peña's activities of "collecting premiums, giving claim documents, giving notice, and providing underwriting reports . . . also support that Peña was an agent for the Insurer." Resp. at 6 (citing Peña Dep. at 47:22–48:3, 48:15–21, 54:6–8). But, even viewing this evidence in the light most favorable to Dream On—as we must, *see Pennington*, 261 F.3d at 1265—Dream On *still* fails to show that "there is a genuine issue for trial," *Bailey*, 284 F.3d at 1243.

"Under New York law, an insurance broker . . . generally [is] considered the agent of the *insured*, not the agent of the insurer." *XL Specialty Ins. Co.*, 420 F. Supp. 3d 172, 192–93 (S.D.N.Y. 2019) (emphasis added) (citing *Centrehigh Ltd. v. Chubb & Son Inc.*, 2012 WL 13042572, at *12

(S.D.N.Y. Feb. 3, 2012)). When a broker is acting only on behalf of the insured, "notice to the . . . broker is not notice to the liability carrier[.]" *Bennion v. Allstate Ins. Co.*, 727 N.Y.S.2d 222, 224 (N.Y. App. Div. 2001) (quoting *Sec. Mut. Ins. Co. v. Acker–Fitzsimons Corp.*, 293 N.E.2d 76, 79 n.3 (N.Y. App. Div. 1972)). "Notice to the broker will constitute [ ] notice [to the insurer], however, if it is established that the broker was acting as the carrier's agent." *Ibid.* (first citing *U.S. Delivery Sys., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 696 N.Y.S.2d 502 (N.Y. App. Div. 1999); and then citing *Serravillo v. Sterling Ins. Co.*, 734 N.E.2d 1213 (N.Y. App. Div. 1999)). A "broker will be held to have acted as the insurer's agent where there is some evidence of action on the insurer's part, or facts from which a general authority to represent the insurer may be inferred." *XL Specialty*, 420 F. Supp. 3d at 193 (quoting *Fid. & Guar. Ins. Underwriters, Inc. v. Jasam Realty Corp.*, 540 F.3d 133, 140–41 (2d Cir. 2008)).

Here, no reasonable juror could infer from Dream On's evidence that Peña was an agent of Clear Spring's or Concept's. For one thing, Peña telling Pyznar that he was a "dual agent" doesn't create an agency relationship between Peña and Clear Spring (or Concept) or make Clear Spring liable for his actions, Pyznar 30(b)(6) Dep. at 46:3–10 (emphasis omitted), since "the existence of apparent authority depends upon a factual showing that the third party relied upon the misrepresentation of the agent because of some misleading conduct on the part of the *principal*—not the agent." *Hallock v. State*, 747 N.E.2d 1178, 1181 (N.Y. 1984) (emphasis added) (first citing *Ford v. Unity Hosp.*, 299 N.E. 2d 659 (N.Y. 1973); and then citing Restatement (Second) of Agency § 27 (Am. L. Inst. 1958)). Because Peña "cannot by his own acts imbue himself with apparent authority," *ibid.*, we must look to whether the insurer's conduct (or other "evidence regarding [the broker's] and [the insurer's] relationship") reasonably supports Dream On's inference, *Erie Painting & Maintenance, Inc. v. Ill. Union Ins. Co.*, 876 F. Supp. 2d 222, 230 (W.D.N.Y. 2012) (citing *Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282, 289 (2d Cir. 2003)).

It doesn't. As to the insurers' conduct, the Policy *expressly* provides that the assured's or beneficial owner's "brokers . . . shall be deemed to be exclusively the agents of [the assured or beneficial owner] and not of [the insurer] in any and all matters relating to, connected with[,] or affecting th[e] insurance." Policy at 12. That language is clear and unambiguous. Nor has Dream On adduced any *other* documents showing that Clear Spring delegated *any* authority to Peña. *Cf. Erie Painting*, 876 F. Supp. 2d at 230 ("There is, however, no evidence that [the insurer] imbued [the broker] with the authority to accept notices-of-claim on its behalf, only obligating it to forward those that it did receive. This tends to show a lack of an agency relationship." (first citing *Cambridge Realty Co. v. St. Paul Fire & Marine Ins. Co.*, 2010 WL 2399558, at *7 (S.D.N.Y. June 14, 2010); and then citing *Green Door Realty*, 329 F.3d at 290)).

And, contra Dream On's position here, nothing from Peña's deposition even begins to suggest an agency relationship between Peña and Clear Spring or Concept. Dream On identifies three excerpts from Peña's deposition which (it believes) "support [its view] that Peña was an agent for the Insurer." Resp. at 6 (citing Peña Dep. at 47:22–48:3, 48:15–21, 54:6–8). We'll consider—and reject—each in turn.

Here's the first one:

> Q. Yeah. Your -- your insureds, they pay you first, correct, and then you pay Lucantha or somebody else, correct?
>
> A. Yes. That is -- that is correct, depending on -- depending on the risk. There are carriers, like American Modern, where the insured pays directly American Modern. We don't -- Nobody touches it.

Peña Dep. at 47:22–48:3.

Peña doesn't even mention Clear Spring or Concept here. And Dream On never explains how Peña's collection of premiums for *Lucantha*—a completely different company, *see* JSOUF ¶ 3 ("Lucantha had no authority to act on behalf of or bind Clear Spring [or] Concept." (emphasis omitted) (first citing Usher Decl. ¶¶ 14–15; and then citing Usher 30(b)(6) Dep. at 90:20–91:1))—

implicates his relationship with Clear Spring or Concept, *see generally* Resp. We (obviously) won't be filling in the blanks for Dream On. *See M.Y. P.I.I. LLC v. H&R Marine Eng'g, Inc.*, 544 F. Supp. 3d 1334, 1346 (S.D. Fla. 2021) (Altman, J.) ("The law . . . doesn't—nor should it—permit lawyers to fling whatever arguments they might conjure (however far-fetched or frivolous) at the judge in the hopes that, by a prodigious use of a Westlaw account, that intrepid judge (and his smart law clerk) might find the one case that stands in support of their proposition.").

Here's the second:

Q. No. I just -- I just asked if you believe you have a duty to cooperate with the adjusting of the claim -- the investigation and adjustment.

A. Oh, cooperate?

Q. Yeah. Give them documents, provide them notice --

A. Yes.

Peña Dep. at 48:15–21.

Dream On doesn't tell us how Peña's cooperation with the insurer's readjustment process—an obligation imposed on the *insured*, *see* Policy at 15–16 ("Your duties in the event of a loss[:] . . . Cooperate with us in the investigation, defence [sic] or settlement of any loss[.]"); *see also Allstate Ins. Co. v. Abbot*, 174 N.Y.S.2d 181, 182–83 (N.Y. App. Div. 1958) ("Co-operation with the insurer is one of the conditions of the policy [u]pon a breach of this condition the insurer can elect to terminate the contract." (citing *Coleman v. New Amsterdam Cas. Co.*, 160 N.E. 367 (N.Y. 1928)))—transforms Peña into an agent of the *insurer*. So, this testimony is also irrelevant.

And here's the last one:

Q. [Did you ever create] [a]ny type of underwriting report, like, from your agency[?]

A. Yeah.

Peña Dep. at 54:6–8.

Dream On (once again) leaves us to guess about the extent to which this excerpt relates to Clear Spring or Concept. After reading this passage in context, though, it's clear to us that Peña only testified to creating reports for *Lucantha*—a fact Dream On's counsel acknowledged. Here's that exchange:

| | |
|---|---|
| Q. | Did you ever prepare any underwriting reports regarding this policy? |
| MS. GOLDMAN: | Objection. |
| THE WITNESS: | Can you be more specific? What do you mean by "underwriting reports?" . . . |
| Q. | Yeah. Did you ever create any type of document other than the application to send to Lucaya or Concept? |
| MS. GOLDMAN: | Lucantha. . . . |
| Q. | Lucantha. Sorry. |
| A. | You mean to -- Are we -- Can you be more specific on that? Are you speaking on-- |
| Q. | Sure. |
| A. | -- on the application form? Other than the application form, was -- |
| Q. | Yes. |
| A. | -- anything else provided to Lucantha? |
| Q. | Any type of underwriting report, like, from your agency. |
| A. | Yeah. Underwriting, you know, I don't -- I'm not sure what you consider a report, but everything that was provided to Ms. Goldman on the discovery was everything that was ever sent to Lucantha, all the documents, which I have copies of[.] |

*Id.* at 53:11–54:13.

Because Peña was here talking about Lucantha—and *only* Lucantha—this passage likewise provides *no evidence* of an agency relationship between Peña and Clear Spring (or Concept). Dream

On has therefore failed to create a "genuine issue for trial," FED. R. CIV. P. 56(e), on whether Pyznar's disclosure of the July 2018 Loss to Peña constituted a disclosure to Clear Spring.

*Third*, Dream On contends that, because Concept later "underwrote and placed a second insurance policy [on the Vessel] with full knowledge of the prior loss . . . for the substantially same price [as the first policy,]" there remains "a question of fact whether a reasonable underwriter would underwrite a policy with knowledge of the loss and history of the [V]essel." Resp. at 17 (first citing Temporary Binder [ECF No. 41-1]; then citing Peña Dep. at 55:1–16; and then citing Pyznar 30(b)(6) Dep. at 83:4–84:5). But Concept's decision to underwrite a *subsequent* policy (by itself) tells us nothing about the materiality of the Vessel's loss history, since a fact is "material" to the risk calculation so long as it "*might* have a bearing on the underwriter's decision to accept or reject the insurance, *or with respect to what premium to charge.*" *Giroire*, 27 F. Supp. 2d at 1311 (emphases added) (citing *Jackson*, 767 F. Supp. 268). And, sure enough, "Concept, with knowledge of the loss and history of the [V]essel," Resp. at 17 (cleaned up); *see also* Manual at 6 ("If an owner has had previous losses, these must be taken into consideration when deciding whether or not to offer terms and these will impact the price charged."), charged Dream On a *higher* premium for the second policy, *compare* Policy at 1 ("Total Premium: [$]20,012 cancelling returns only + [$]35 Certificate Fee"), *with* Temporary Binder at 4 ("Total Premium: [$]25,643 cancelling returns only + [$]35 Certificate Fee"). This final argument thus likewise fails.

Clear Spring has established that there's no genuine issue of material fact as to whether Dream On's failure to disclose the July 2018 Loss was material to the calculation of insurance risk. The undisputed evidence establishes that Dream On's disclosure of the July 2018 Loss "might have [had] a bearing on the risk to be assumed by the insurer," *HIH Marine*, 211 F.3d at 1363 (cleaned up), meaning that Dream On was obligated to disclose that fact under the doctrine of *uberrimae fidei*, *id.* at 1362 ("[*Uberrimae fidei*] requires that an insured fully and voluntarily disclose to the insurer all

facts material to a calculation of the insurance risk." (cleaned up)). Since Dream On didn't do that, Clear Spring is entitled to summary judgment on its *uberrimae fidei* claim. The Plaintiff's Motion for Summary Judgment is **GRANTED**.

* * *

Because Dream On's material misrepresentation of the Vessel's loss history breached the doctrine of *uberrimae fidei*, Clear Spring is entitled to have the policy **DECLARED** void *ab initio*. *See HIH Marine*, 211 F.3d at 1363 ("Under *uberrimae fidei*, a material misrepresentation on an application for marine insurance is grounds for voiding the policy." (cleaned up)). We thus needn't consider whether Dream On's failure to disclose Captain Rodriguez's criminal conviction *also* breached that duty. *See* Amnd. Compl. ¶¶ 57–63 (basing this claim in the nondisclosure of either "Rodriguez['s] . . . criminal convictions" or Dream On's "fail[ure] to disclose th[e] prior loss"); *QBE Seguros v. Morales-Vazquez*, 986 F.3d 1, 10 (1st Cir. 2021) ("[The] omission or misrepresentation of *a* material fact is a sufficient ground, in and of itself, to allow an insurer to void a policy of marine insurance." (emphasis added)).

Nor must we proceed with any of Clear Spring's remaining counts. Each of those counts seeks a declaration that the Policy *doesn't* cover the July 2021 Loss—relief Clear Spring is already entitled to under Count VI. *See Organo Gold Int'l, Inc. v. Aussie Rules Marine Servs., Ltd.*, 416 F. Supp. 3d 1369, 1376–77 (S.D. Fla. 2019) (Ruiz, J.) ("Where, as here, the declaratory judgment count would serve no useful purpose because the issues will be resolved by another claim, courts generally decline to entertain the declaratory judgment count." (first citing *Goodbys Creek, LLC v. Arch Ins. Co.*, 2009 WL 10671130, at *5 (M.D. Fla. Aug. 11, 2009) (Howard, J.); then citing *Gendler v. Related Grp.*, 2009 WL 10668980, at *4 (S.D. Fla. Sept. 14, 2009) (Ungaro, J.); then citing *Martino v. City Furniture, Inc.*, 2006 WL 8431397, at *4 (S.D. Fla. Nov. 8, 2006) (Johnson, Mag. J.); then citing *Marotto v. Scottsdale Ins. Co.*, 2008 WL 2952830, at *2 (M.D. Fla. July 30, 2008) (Moody, J.); and then citing *Knights*

24

*Armament Co. v. Optical Sys. Tech., Inc.*, 568 F. Supp. 2d 1369, 1375 (M.D. Fla. 2008) (Conway, J.))).

We'll therefore **DISMISS** Counts I–V of the Amended Complaint **as MOOT**.

We can also dispose of Dream On's counterclaims for breach of contract and *uberrimae fidei*.
*See* Amnd. Ans. at 9–11. Both of these claims are "dependent on the existence of a marine insurance contract between the parties." *Clear Spring Prop. & Cas. Co. v. Astonbluwaves LLC*, 2024 WL 665673, at *8 (S.D. Fla. Jan. 24, 2024) (Sanchez, Mag. J.), *report and recommendation adopted*, 2024 WL 664136 (S.D. Fla. Feb. 16, 2024) (Williams, J.). Since the Policy is void, there can be no contract between the parties. *See* Policy at 4 ("This is a legally binding insurance contract[.]"); *see also Quintero v. Geico Marine Ins. Co.*, 389 F. Supp. 3d 1153, 1161 n.3 (S.D. Fla. 2019) (Ungaro, J.) ("[U]nder *uberrimae fidei*, [the] Policy is void *ab initio*, and therefore any limits on *cancellation* are irrelevant; the Policy is not cancelled, it never came into effect."), *aff'd*, 983 F.3d 1264 (11th Cir. 2020). And, without an underlying contract, Dream On's counterclaims are **MOOT**. *See La Dolfina S.A., LLC v. Meeker*, 2023 WL 10672906, at *12 (S.D. Fla. Dec. 15, 2023) (Cannon, J.) ("In light of the Court's determination that the 2009 Agreement is an unenforceable contract, [the defendant's] Counterclaim [for breach of contract] is moot . . . [and] due to be dismissed.").

One last thing. Clear Spring also seeks a judgment that "the costs of this action be taxed against the Defendant." Amnd. Compl. at 13. The parties, however, haven't briefed this issue at all. *See generally* MSJ; Resp. We'll therefore allow Clear Spring to file a separate Motion to Tax Costs, explaining the basis for (and the value of) any cost award.

\* \* \*

Accordingly, we hereby **ORDER and ADJUDGE** as follows:

1. The Plaintiff's Motion for Summary Judgment [ECF No. 40] is **GRANTED**.

2. Summary Judgment is **ENTERED** in favor of the Plaintiff, Clear Spring Property and Casualty Co., and against the Defendant, Dream On Yacht LLC, on Count VI of the Plaintiff's Amended Complaint [ECF No. 27].

3. It is hereby **DECLARED** that:

  a. Clear Spring Property and Casualty Co.'s Policy No. CSRYP/203287 is void *ab initio*;

  b. Clear Spring Property and Casualty Co.'s Policy No. CSRYP/203287 does not afford coverage to Dream On Yacht LLC for the partial sinking of June 25, 2021.

4. Counts I–V of the Plaintiff's Amended Complaint [ECF No. 27] are **DISMISSED as MOOT**.

5. The Defendant's counterclaims for breach of contract and breach of *uberrimae fidei* [ECF No. 34] are **DISMISSED as MOOT**.

6. The Plaintiff shall file its Motion to Tax Costs within **thirty days** of the entry of final judgment.

7. All other relief requested in the Plaintiff's Amended Complaint [ECF No. 27] is **DENIED as moot**.

8. Pursuant to Federal Rule of Civil Procedure 58, the Court will enter final judgment separately.

9. This case shall remain **CLOSED**. All other deadlines are **TERMINATED**, and any pending motions are **DENIED as moot**.

  **DONE AND ORDERED** in the Southern District of Florida on September 12, 2024.

  _____
  **ROY K. ALTMAN**
  **UNITED STATES DISTRICT JUDGE**

cc:    counsel of record